## Wilson Appeal.

Argued December 10, 1968. Before WRIGHT, P. J., WATKINS, MONTGOMERY, JACOBS, HOFFMAN, SPAULDING, and HANNUM, JJ.

*Lois G. Forer,* with her *Daniel H. Shertzer,* for appellant.

*Theodore A. Parker,* First Assistant District Attorney, with him *James F. Heinly,* Assistant District Attorney, and *Clarence C. Newcomer,* District Attorney, for Commonwealth, appellee.

OPINION PER CURIAM, March 20, 1969:
Order affirmed.

———

DISSENTING OPINION BY HOFFMAN, J.:

Charles Laverne Wilson was adjudged delinquent by the Juvenile Court of Lancaster County and committed to the State Correctional Institution at Camp Hill.

This appeal which attacks that commitment follows:

The adjudication of Wilson as a delinquent arose out of an inter-racial street fight in the City of Lancaster in which a group of boys attacked a group of men for reasons which are unclear from the record. Wilson, a 16 year old boy, was arrested and brought before the Juvenile Court where he was identified by two others as having punched each of them in the face. One complaining witness was 24 years old, 6 feet 5 inches tall and weighed about 230 pounds. The other was 26 years of age. The record does not indicate his height and weight. No permanent damage was inflicted upon either as a result of the fight, and their injuries attributable to Wilson's direct participation in the fight are negligible.

After all testimony was given, the lower court immediately sentenced Wilson. The following colloquy with defense counsel and Wilson occurred.

"Mr. Hummer: Your Honor, I would like to say one thing. I think it is obvious from his testimony that this is not one of the leaders in whatever this gang consisted of, or what occurred here, and I don't even believe he was one of the main perpetrators. I think

he was perhaps along with them, and as his own testimony was, he admitted that he did participate in the fracas. The Court: Well, of course he has been in trouble before. In 1965 he was charged with burglary and placed on probation. You also have some trouble in going to school, don't you? Defendant: Yes, sir. The Court: Were you suspended from school also? You seem to be in need of some stricter discipline. Isn't that about right? Defendant: I don't know. The Court: You don't know. Well, if you don't know, the court so finds from the testimony in this case and from your prior conduct. The court adjudges Charles Laverne Wilson a delinquent and commits him to the State Correctional Institution at Camp Hill, Pennsylvania. . . . If you apply yourself and work you can make a man out of yourself."

That commitment is now under attack on two grounds, (1) that it is unconstitutional, as a violation of equal protection, to commit Wilson to Camp Hill for a possible term of sentence in excess of the maximum term that he could serve were he sentenced pursuant to The Penal Code by the Court of Quarter Sessions for the same substantive offense; and (2) the commitment is subject to appellate review and, as such, must be stricken because it is disproportionate to the offense committed and inconsistent with the purposes of the Juvenile Court Act.

I will discuss each contention separately.

## Violation of Equal Protection

It is conceded by the Commonwealth that were Wilson certified to the Court of Quarter Sessions and tried as a criminal offender, he could only have been convicted on two counts of simple Assault and Battery and sentenced to a maximum of 4 years imprisonment,

(two years for each count). Act of June 24, 1939, P. L. 872, §708, 18 P.S. 4708. The Commonwealth, however, contends that Wilson could also have been convicted of Aggravated Assault and Battery under the same Act, §709, 18 P.S. 4709, which provides: "Whoever unlawfully and maliciously inflicts upon another person, either with or without any weapon or instrument, any grievous bodily harm, or unlawfully cuts, stabs or wounds any other person . . . shall be sentenced, . . . to simple imprisonment, not exceeding three (3) years." I disagree because it is apparent that, at most, Wilson only punched two persons and neither punch has resulted in lasting injury or grievous bodily harm, the latter being a requirement for a conviction for aggravated assault and battery.

The Supreme Court stated in *Commonwealth v. Comber*, 374 Pa. 570, 582, 97 A. 2d 343 (1953): "To convict of assault and battery the Commonwealth must prove that the defendant had a criminal intent—the assault and battery must have been intentional, . . . . To convict of aggravated assault and battery, the Commonwealth must prove not only an intentional assault and battery but also . . . that the battery resulted in grievous bodily harm." Grievous bodily harm has been defined as meaning atrocious, aggravated, and heinous and it relates to what might be considered distressing injuries. *Commonwealth v. Holgate*, 75 Pa. Superior Ct. 471 (1921). Under this standard a punch in the face, which in and of itself requires no medical treatment or attention, cannot be classified as an aggravated assault. Accordingly, Wilson, were he tried in the Court of Quarter Sessions could have been sentenced to a maximum of four years imprisonment.[1] Instead,

---

[1] It should be noted, however, that barring extenuating circumstances persons convicted of simple assault and battery are given suspended sentences and placed on probation.

since Wilson was sixteen years old when committed to Camp Hill by the Juvenile Court, he faces a maximum imprisonment of 5 years until he reaches twenty-one years of age. Act of June 2, 1933, P. L. 1433, §12, 11 P.S. 254.

Therefore, the question of whether his commitment to Camp Hill for a maximum five year sentence raises a denial of equal protection is squarely before us.

In *Commonwealth v. Daniel*, 430 Pa. 642, 243 A. 2d 400 (1968), the Supreme Court set out the standard for determining whether one class of persons may constitutionally be subject to a greater maximum sentence for the same substantive offense than would another class of persons. The court stated that such a discrepancy in sentencing men and women must be stricken as unconstitutional because "we fail to discern any reasonable and justifiable difference or deterrents between men and women which would justify a man being *eligible* for a shorter maximum prison sentence than a woman for the commission of the same crime. . . ."

In applying this standard, the issue before us must be framed as follows: Assuming both have committed the same substantive offense, is there any reasonable justification for an adjudged delinquent being subject to a greater potential maximum incarceration at Camp Hill than a juvenile sentenced to imprisonment by the Court of Quarter Sessions pursuant to The Penal Code?

Generally, law-breaking juveniles, in treatment and adjudication, have been treated differently from persons in the criminal courts. The justification for this distinction was first approved in *Commonwealth v. Fisher*, 213 Pa. 48, 62 Atl. 198 (1905), wherein the Supreme Court upheld Pennsylvania's original Juvenile Court act. In language, now familiar in content and spirit, the court stated that "the objection that

'the act offends against a constitutional provision in creating, by its terms, different punishments for the same offense by a classification of individuals,' overlooks the fact, hereafter to be noticed that it is not for the punishment of offenders, but for the salvation of children, and points out the way by which the state undertakes to save, not particular children of a special class, but all children under a certain age, whose salvation may become the duty of the state in the absence of proper parental care or disregard of it by wayward children. No child under the age of sixteen years is excluded from its beneficent provisions.—Its protecting arm is for all who have not attained that age and who may need its protection. It is for all children of the same class. That minors may be classified for their best interests and the public welfare, has never been questioned in the legislation relating to them. . . . To save a child from becoming a criminal, or from continuing in a career of crime, to end in maturer years in public punishment and disgrace, the legislature surely may provide for the salvation of such a child, if its parents or guardian be unable or unwilling to do so. . . . When the child gets there and the court, with the power to save it, determines on its salvation, and not its punishment, it is immaterial how it got there."

This rationale has served as the justification for the distinctive services and treatments made available only to adjudged delinquents and underlies the Juvenile Court Act of June 2, 1933, P. S. 1433, §8, 11 P.S. 250 (as amended). ". . .(T)he judge or judges shall, after an inquiry of the facts, determine whether the best interests and welfare of a child and the State require the care, guidance and control of such child."

This language has been interpreted by the Supreme Court to mean that "The proceedings in (the Juvenile Court) are not in the nature of a criminal trial but

constitute merely a civil inquiry or action looking to the treatment, reformation and rehabilitation of the minor child. Their purpose is not penal but protective, aimed to check juvenile delinquency and to throw around a child, just starting, perhaps, on an evil course and deprived of proper parental care, the strong arm of the State acting as parens patriae. The State is not seeking to punish an offender but to salvage a boy who may be in danger of becoming one, and to safeguard his adolescent life. Even though the child's delinquency may result from the commission of a criminal act the State extends to such a child the same care and training as to one merely neglected, destitute or physically handicapped." *Holmes Appeal,* 379 Pa. 599, 109 A. 2d 523 (1954).

Consequently, a rational distinction can be made in most instances between the treatment and sentencing of an adult criminal and a minor adjudicated as delinquent, who have committed the same substantive offense.

The facts in the instant case, in my view, however, fall beyond the rationale which ordinarily justifies the disparities in treatment between an adjudged delinquent and a juvenile criminal sentenced pursuant to The Penal Code.

A minor between the ages of 16 and 18 may, at the discretion of the court, be treated either as an adult criminal offender and tried before the Court of Quarter Sessions or as a juvenile and tried under the Juvenile Court Act. *Commonwealth ex rel. Firmstone v. Myers,* 202 Pa. Superior Ct. 292, 196 A. 2d 209 (1963). Act of June 2, 1933, P. L. 1433, §14, as amended, 11 P.S. 256.

In most instances, the juvenile is tried by the Juvenile Court. Those cases involving more serious crimes, or juveniles with prior bad records, however, are apt

to be tried in Quarter Sessions Court where the care and solicitude of the court is less apparent. Accordingly, a juvenile who is tried and convicted as an adult offender faces a more severe penalty than his counterpart who is adjudged delinquent in juvenile court proceedings.

It is ironic, therefore, that in the instant case, appellant was given a potentially greater maximum sentence by the juvenile court of Lancaster County than he would have faced were he tried as an adult pursuant to The Penal Code.

This distinction, however, may not on its face be unconstitutional as a violation of equal protection if the adjudged delinquent is committed to an institution which will extend to him services which offer more care and solicitude than that offered to youngsters convicted and sentenced by the Quarter Sessions Court. Under such circumstances, the disparity in length of commitment may be justified.

The facts in this case, however, do not support any such distinction.

We should, I believe, take judicial notice that juveniles sentenced to terms of imprisonment by Courts of Quarter Sessions are invariably committed to the State Correctional Institution at Camp Hill for a sentence not in excess of the maximum term specified by The Penal Code. For instance, as of this writing, there are only 19 juveniles who have been convicted of crimes in proceedings before Courts of Quarter Sessions who are incarcerated in state prisons other than Camp Hill.

It is also true, however, that Camp Hill is the institution where adjudged delinquents who have committed the most serious and heinous crimes and who have the poorest records are sentenced by the Juvenile Court. It is commonly accepted that incarceration in Camp Hill is the most severe sentence that the Juvenile Court can impose on an adjudged delinquent,

For all practical purposes, therefore, it makes no difference to a juvenile who has committed a serious crime whether he is adjudged delinquent in Juvenile Court or found guilty in the Court of Quarter Sessions, since he will be sent to Camp Hill in either event.

Those adjudged delinquent and those convicted of crime receive identical treatment at Camp Hill. Accordingly, there is no justification for allowing an adjudged delinquent to be sentenced to a greater term at that institution than the maximum term to which his Quarter Sessions Court counterpart would be exposed. Appellant's commitment, therefore, was a violation of his right to equal protection.

### Review of the Commitment as an Abuse of Discretion

In my view, a second ground requiring Wilson's resentencing, arises from the fact that Wilson's Camp Hill commitment for a maximum term of five years bears no rational relation to his past record or to the assault with which he was charged. Moreover, the commitment was in clear disregard of the care and solicitude which the Juvenile Courts are required to exercise by the Juvenile Court Act. Such disregard is subject to this court's review.

In *Holmes Appeal*, 175 Pa. Superior Ct. 137, 146 (1954) alloc., supra, we stated that the record of the Juvenile Court proceedings "must be legally and factually adequate to sustain the findings of fact and *order of commitment.* (citation omitted). Within this framework the Juvenile Court is, under the law granted broad discretionary power. The action of the Juvenile Court is always subject to appellate review and correction for errors of law or abuse of discretion." (emphasis added).

In the instant case, the Juvenile Court based its commitment order on a limited inquiry which failed to present a complete and accurate picture of Wilson's needs. No testimony was solicited from Wilson or his mother, who was present through the hearing, as to his home life. Further, no psychiatric examination was ordered nor did any probation officer testify as to Wilson's background. In short, the commitment order rested solely upon the fact that Wilson had participated in a street fight and that he had a prior record which was before the court at the hearing. Reading from this record the lower court found that Wilson had previously been "charged with burglary" and placed on probation and that he had "some trouble in going to school."

My own reading of Wilson's probation record, secured from the Juvenile Court of Lancaster County, however, negates the seriousness of this past conduct. The "burglary" mentioned by the lower court refers to an incident which occurred when Wilson was 13 years old. At that time he broke a window in a public school, ran water in the school's toilet bowls and knocked a soap dispenser from the wall for a total damage of $8. He was placed on 14 months probation, and from the record, his conduct appears to have been satisfactory in that interval.

Wilson was also expelled from school for a reason omitted from his record, when he was sixteen, and a few months before the assault he was accused of, but never prosecuted for, using profane language in a diner.

On this record, the Juvenile Court committed appellant to Camp Hill. In determining whether this commitment represents an abuse of discretion it is important to briefly sketch the character of Camp Hill.

Camp Hill is not a camp. Rather it is a maximum security prison designed to house hardened and dan-

gerous, albeit young, criminals. Consequently, the institution is characterized by a grim and restrictive atmosphere which is usually associated with such institutions. The residence areas are cell blocks, with each inmate occupying a cell with bars, indistinguishable from cells in other maximum security institutions. Camp Hill has recreation areas, but overlooking them is a surrounding security gate and turrets wherein guards, equipped with guns, survey the area beneath them. Moreover juveniles of 16 years of age share common quarters with criminals of up to 25 years of age who have been committed to the institution by Quarter Sessions Courts. These criminals who constitute thirty-five percent of the prison population act as tutors in crime and in base morality to impressionable teenagers. In these aspects, inmate life at Camp Hill bears a striking resemblance to life in a state penitentiary.

Within this context, the institution is well maintained, carefully supervised and directed by a competent staff and a concerned penologist. Inmates are offered the opportunity to secure High School Equivalence diplomas as well as to learn many trades. Nevertheless, its penal characteristics have a pervasive influence which often overshadow the benefits that can be derived from the prison's religious facilities and education program.

In light of these facts, and considering appellant's prior Juvenile Court record and the nature of the assault for which he was charged, I think that the commitment order represents a shocking abuse of judicial discretion.

Appellant, 16 years of age, is not a hardened criminal nor a boy beyond rehabilitation. Rather he is able to take advantage of any one of the many fine services and institutions other than Camp Hill to which he

could have been referred by the Juvenile Court. I cannot condone sending this boy of sixteen to a maximum security prison for a possible five year term.

I would find that the lower court committed a gross abuse of discretion in sending Wilson to Camp Hill. I recognize that in most cases the commitment order of a Juvenile Court must be upheld. But on the facts in the instant case, review of the commitment and an order of resentencing is appropriate, especially in light of the solicitude and concern for the child which underlies the extraordinary powers of the Juvenile Court.

I would vacate the order of commitment below and remand for a recommitment in accordance with the principles outlined in this opinion.

SPAULDING, J., joins in this dissenting opinion.