369 A.2d 809
**COMMONWEALTH of Pennsylvania**
v.
**Bennie Lee SCOTT, Appellant.**

Superior Court of Pennsylvania.

Submitted Dec. 16, 1975.

Decided Nov. 22, 1976.

Joseph M. Casey, Assistant Public Defender, Philadelphia, for appellant.

Steven H. Goldblatt, Assistant District Attorney, and F. Emmett Fitzpatrick, District Attorney, Philadelphia, for appellee.

Before WATKINS, President Judge, and JACOBS, HOFFMAN, CERCONE, PRICE, VAN der VOORT and SPAETH, JJ.

HOFFMAN, Judge:

Appellant, a juvenile, raises several contentions challenging the juvenile court's finding that appellant was delinquent: (1) that the Commonwealth presented insufficient evidence to prove robbery and simple assault; (2) that evidence of an out-of-court identification should have been suppressed because appellant was denied his right to counsel at the lineup; and (3) that an oral statement made by appellant to the arresting officer should have been suppressed.[1]

Appellant was arrested in the home of his cousin, Willie Clark, on the morning of April 14, 1975. He was charged in a juvenile petition with robbery, "purse snatch," theft, receiving stolen property, and simple assault. Appellant filed a motion to suppress and a hearing was held on July 7, 1975, at which time the following facts were presented: At about 6:30 a. m., on April 14, 1975, the complainant was waiting for a bus at the corner of 16th and Dauphin Streets, Philadelphia, when a young man "snatched" her purse and fled around the corner. Police arrived shortly thereafter. The complainant described her assailant as a black male, 16 or 17 years-old, about 5' 10", wearing a green jacket and blue pants.

A few minutes after the incident occurred, Officer Huff of the Philadelphia Police Department, received a radio call describing the suspect. When the officer arrived in the vicinity where the purse snatching had taken place, an unidentified motorist told the officer that a youth, about 5' 10", carrying a woman's purse, had run into a home on North 16th Street. The officer testified as follows: "I went to this house, and I was admitted by a Mr. Clark. I asked him did anyone come into the

1. Appellant also contends that the lower court should have recused itself because it had heard inadmissible hearsay during the suppression hearing. Because of our disposition of the other issues, we need not reach this claim.

house, and he said he didn't know. I asked him would it be all right—I told him what happened, and I asked him would it be all right to look around.

"He said it was fine, it was all right.

"I asked him what was upstairs.

"He said a cousin of his, . . ..

"I went to the second floor, and I saw [appellant] there on the second floor. . . .

"Q. What was he doing?

"A. He was laying on the bed, and I got him up off the bed. He had on no shirt, just a pair of trousers—I think they were short trousers.

"Q. What happened?

"A. I asked Mr. Clark could I look around and search the house, and he said, yes . . . .

"I looked in the dresser and inside a drawer was a small change purse.

"Q. In which room is this dresser?

"A. In the room where the defendant was, on the second floor.

"Q. Then what happened?

"A. I took the pocketbook—the defendant had went back downstairs—I took the pocketbook and held it in my hand, and I went downstairs and asked did anyone have any money upstairs. . . .

"About two minutes later [appellant] said he had money, he had been saving money to buy something."

The complainant's identification was found in the purse. At that point, appellant was arrested and taken to the 17th and Montgomery stationhouse.

Meanwhile, the police had taken the complainant to the police station. Shortly thereafter, the police arrived with appellant and conducted a lineup. "[The police] brought them into the precinct; there were four—practically five with [appellant],—and they just had them

64

stand there. . . ." The complainant identified appellant at that time. At some point after the arrest, the police returned the purse and the money to the complainant.

After the Commonwealth rested, the court stated: "I am denying the motion. Mr. Clark was a nice person to let the officers in.

"This is one of the finest pieces of police work I have heard.

"Mrs. Branson, this officer really did a beautiful job, and that is how you got your money back. If I had a gold medal I would give it to him.

"Will you stop worrying about constitutional rights of a felon—it was done instantly, and he was caught right there with the goods.

"You know you took it. There is no question about it. Why don't you have the guts to say, 'Yes, I did it?'

"For heavens' sake, [appellant] has been known to this court so many years, it is just a joke wasting the time of the Court on technicalities.

"Delinquent."

At that point, after the court had adjudicated appellant delinquent, the Commonwealth moved to incorporate the testimony and to rest its case. Defense counsel then informed the court that appellant had hoped to present a defense and asked the court to recuse itself because it had already adjudicated appellant delinquent and had also heard inadmissible hearsay evidence during the suppression hearing. The court refused. Appellant defended by denying that he had left his cousin's house during the night and that he was still in bed, asleep when the police arrived.

After defense counsel rested, the court again found appellant delinquent and ordered him committed to Camp Hill. This appeal followed.

■■ Appellant contends that the evidence was insufficient to sustain the court's finding that appellant committed a robbery and simple assault. The entire testimony on the subject was offered by the complainant:

"Q. Did something happen to you on the 14th of April?

"A. Yes.

"Q. Will you tell the Court where you were and how it happened?

"A. I was standing on the corner of 16th and Dauphin getting ready to go to work, about six-thirty in the morning.

"Q. What happened?

"A. This young man came and snatched my purse.

"Q. Where did he come from?

"A. From down the street somewhere.

"Q. How did he get it from you?

"A. I had it in my hand.

"Q. Where did he go with it?

"A. He just ran around the corner with it."

Section 3701 of the Crimes Code[2] defines robbery as follows:

"(1) A person is guilty of robbery if in the course of committing a theft, he:

"(i) inflicts serious bodily injury upon another;

"(ii) threatens another with or intentionally puts him in fear of immediate serious bodily injury; or

"(iii) commits or threatens immediately to commit any felony of the first or second degree."

While purse snatching is a serious affront to one's dignity and may, in some instances, rise to the level of a robbery, the complainant's testimony in the instant case

2. Act of December 6, 1972, P.L. 1482, No. 334, § 1; 18 Pa.C.S. § 3701.

simply did not establish the essential elements of a robbery: that appellant's conduct inflicted serious bodily harm or that he threatened the complainant with serious bodily injury. See *In re Winship*, 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970); see also Jarvis, *Pennsylvania Crimes Code and Criminal Law*, §§ 3701, 3923.

The instant case is distinguishable from *Commonwealth v. Farmer*, 241 Pa.Super. 373, 361 A.2d 701 (1976), recently decided by this Court. In *Farmer*, as stated by Judge VAN der VOORT's majority opinion, "[o]n November. 7, 1974, Miss Vanselle Hopson was standing on a street corner in Philadelphia . . . waiting for a bus, when two men approached her unobserved. One of the men, appellant . . . grabbed Miss Hopson's pocketbook and punched her in the face, . . . ." (Emphasis added). We held in *Farmer* that it was reasonable to infer that the victim was placed in fear when two men accosted her and one man punched her in the face. That is, to sustain a conviction under § 3701(1)'(ii), the Commonwealth need not prove a verbal utterance, but could show aggressive actions that threatened serious bodily injury. The record in the instant case does not permit a similar inference. The record indicates an act of stealth; there is no evidence whatsoever that the complainant relinquished her purse in response to any violent act or threat of such an act. There is no basis to infer that the complainant was placed in fear in any way.

In addition, as argued by appellant, the complainant's testimony did not establish a simple assault. "A person is guilty of assault if he:

"(1) attempts to cause or intentionally, knowingly or recklessly causes bodily injury to another;

"(2) negligently causes bodily injury to another with a deadly weapon; or

"(3) attempts by physical menace to put another in fear of imminent serious bodily injury." [3]

The record simply does not contain any reference to whether or not the complainant suffered any injury or whether or not the appellant employed any menacing behavior in an attempt to place the complainant in fear of harm. Thus, we must conclude that the Commonwealth failed to prove that appellant committed a robbery or that he assaulted the complainant.

■ It does not necessarily follow that appellant must be discharged. Appellant concedes that the record clearly proves a charge of theft. Appellant contends, however, that because theft is only a misdemeanor of the second degree, with a maximum sentence of two years, his "indeterminate to three year commitment" at Camp Hill was illegal. *Wilson Appeal*, 438 Pa. 425, 264 A.2d 614 (1970).

The appellant's position, however, ignores the explicit language of § 3903 of the Code, supra: "(b) *Other grades.*—Theft not within subsection (a) of this section, constitutes a misdemeanor of the first degree, except that if the property was not taken from the person or by threat, . . ." The maximum permissible sentence for a misdemeanor of the first degree is five years. 18 Pa.C.S. § 1104. Hence, appellant's commitment would be within the legal limits if appellant had been found delinquent for a theft from the person of the complainant, a crime supported by the record. The court, however, did not specify which charges formed the basis of its finding of delinquency. Thus, although the record could support appellant's commitment, there is a distinct possibility that the commitment was based on charges which the Commonwealth failed to prove. Normally, in this situation we would remand for resentencing. See *Commonwealth v. Lockhart*, 223 Pa.Super. 60, 296 A.2d 883

3. Crimes Code, supra, n. 2; 18 Pa.C.S. § 2701.

(1972). However, because trial errors were committed, appellant is entitled to a new adjudication.

▮ Appellant's second contention is that because he was denied his right to counsel during the lineup, the out-of-court identification should have been suppressed. The Commonwealth did not attempt to prove that appellant had waived his right to counsel. Rather, the Commonwealth argues that the in-court identification had an independent basis and, therefore, testimony concerning the out-of-court identification amounted to harmless error.

The United States Supreme Court held in *Gilbert v. California*, 388 U.S. 263, 272–74, 87 S.Ct. 1951, 1956–57, 18 L.Ed.2d 1178 (1967), that "testimony [of an out-of-court identification] is the direct result of the illegal lineup 'come at by exploitation of [the primary] illegality.' . . . . The State is therefore not entitled to an opportunity to show that that testimony had an independent source. Only a *per se* exclusionary rule as to such testimony can be an effective sanction to assure that law enforcement authorities will respect the accused's constitutional right to the presence of his counsel at the critical lineup. In the absence of legislative regulations adequate to avoid the hazards to a fair trial which inhere in lineups as presently conducted, the desirability of deterring the constitutionally objectionable practice must prevail over the undesirability of excluding relevant evidence. . . . That conclusion is buttressed by the consideration that the witness' testimony of his lineup identification will enhance the impact of his in-court identification on the jury and seriously aggravate whatever derogation exists of the accused's right to a fair trial." Although the Supreme Court has distinguished pre-indictment and post-indictment lineups and has concluded that *United States v. Wade,* 388 U.S. 218, 87 S.Ct. 1926, 18 L.Ed.2d 1149 (1967), and *Gilbert* do not apply

prior to indictment, *Kirby v. Illinois*, 406 U.S. 682, 92 S.Ct. 1877, 32 L.Ed.2d 411 (1972), that position has been rejected by our Supreme Court. *Commonwealth v. Richman*, 458 Pa. 167, 320 A.2d 351 (1974). Thus, *Gilbert* and *Richman* mandate a new adjudication without evidence of the out-of-court identification, unless we conclude that its use amounted to harmless error. *Gilbert v. California*, supra.

■■ The complainant testified that she observed her assailant in sufficient lighting. On the other hand, the encounter was brief. The evidence of guilt was not overwhelming; thus, it is likely that the out-of-court identification bolstered the witness's credibility when she identified appellant in the courtroom. On remand, the Commonwealth may be able to prove that an in-court identification has a basis independent of the post-arrest lineup. *United States v. Wade,* supra. That is a separate question from whether or not admission of the out-of-court confrontation was harmless in the initial trial. We conclude that it was not.

■ Appellant also contends that the lower court erred in refusing to suppress an oral statement made by appellant to the arresting officer.

The arresting officer discovered appellant in bed, in a second floor bedroom. He testified that "I looked in the dresser and inside a drawer was a small change purse.

"Q. In which room is this dresser?

"A. In the room where the [appellant] was, on the second floor.

"Q. Then what happened?

"A. I took the pocketbook—the [appellant] had went back downstairs—I took the pocketbook and held it in my hand, and I went downstairs and asked did anyone have any money upstairs. Mr. Clark and a lady there—I took her to be Mrs. Clark—they all said, no, they didn't have any money, and so did [appellant].

70

"About two minutes later [appellant] said he had money, he had been saving to buy something.

"I asked him how much money did he have.

"He said he didn't know—he said, 'About one hundred dollars.' "

The arresting officer had a description of appellant when he entered the Clark residence. Further, he found the victim's purse in appellant's room. Given that evidence, the officer's suspicion had focused on appellant as a suspect. The Commonwealth concedes that appellant was not given his "Miranda" warnings, but contends that appellant's statement was not inculpatory. We disagree. By attempting to explain away the existence of the one hundred dollars, appellant admitted indirectly that he was linked to the crime. Obviously, the officer believed that appellant's statement was an admission of ownership of the stolen money, because he arrested him immediately after their conversation.

Therefore, we reverse appellant's conviction and remand for a new trial. At that time, the Commonwealth may be able to prove that the complainant's in-court identification has a basis independent of the original lineup. The Commonwealth may not rely on that out-of-court identification. Further, the Commonwealth is precluded from using appellant's oral statement to the arresting officer.

Finding of delinquency reversed and case remanded.

VAN der VOORT, J., concurs in the result.

SPAETH, J., files a concurring opinion.

SPAETH, Judge, concurring:

I concur in the result reached by the majority. I think the judge should have recused himself and therefore do not reach the other issues. Also, I remain of the view that Commonwealth v. Farmer, 241 Pa.Super. 373, 361 A.2d 701 (1976), was, for the reasons there stated by me in dissent, wrongly decided.